UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

| | |
|---|---|
| MIDSTATE FINANCE COMPANY, INC., ) | |
| ) | |
| *Plaintiff/Appellant*, ) | |
| ) | Case No. 4:17-cv-6 |
| v. ) | |
| ) | Judge Curtis L. Collier |
| JUSTIN PEOPLES and ) | |
| CATHY PEOPLES, ) | |
| ) | |
| *Defendants/Appellees*. ) | |

| | |
|---|---|
| IN RE: ) | |
| JUSTIN PEOPLES and ) | Bankr. Case No. 15-14773-SDR |
| CATHY PEOPLES ) | Chapter 13 |
| ) | |
| *Debtors*. ) | |

## **M E M O R A N D U M**

This matter comes before the Court on appeal from the Bankruptcy Court. Appellant Midstate Finance Company ("Midstate") appeals the Bankruptcy Court's order, entered on November 29, 2016, confirming Appellees Justin and Cathy Peoples's (the "Debtors") Chapter 13 plan. The Court heard oral arguments in this matter on March 14, 2018. For the reasons stated herein, the Court will **AFFIRM** in part and **REVERSE** in part the Bankruptcy Court's order and will **REMAND** the case to the Bankruptcy Court for further proceedings consistent with this opinion.

### I.     **BACKGROUND**

This case began as a Chapter 7 proceeding. On October 30, 2015, the Debtors filed a voluntary Chapter 7 petition. On Schedule A of the petition, they listed certain real property they

owned at that time: "Mobile Home/24x28 Shop/5 Acre Lot." (Doc. 10 at 23.) The Debtors assigned a value of $43,000 to the lot. Schedule C of the petition set forth the claimed homestead exemption under Tenn. Code Ann. § 26-2-301(e), in the amount of $20,000. (*Id*. at 28.)

The appointed Trustee, Trudy Edwards, filed a Motion to Approve Compromise and Settlement ("Original Sale Motion") on May 23, 2016. (*Id*. at 46.) The motion included the appraised value of the Debtor's real property, as determined by appraiser and real estate agent Wendell Hanson, at $21,000, or $3,500 per acre. The Trustee stated she intended to accept the Debtors' offer of $18,000, or $3,000 per acre, as this was the highest offer received. The Bankruptcy Court approved the settlement.

Midstate—one of the unsecured creditors[1]—responded in opposition to the Original Sale Motion on May 26, 2016. (*Id*. at 50.) Midstate pointed out that the Debtors actually owned two tracts of land instead of the one tract disclosed in the Chapter 7 petition: (1) the one-third acre tract upon which the Debtors' mobile home and shop sat (the "Improved Tract") and (2) an adjacent unimproved lot of approximately five acres (the "Unimproved Tract") (together, the "Property"). Midstate also included in its response an offer to purchase the Unimproved Tract for a sum of $21,000.

When the Debtors learned of Midstate's offer, they initially informed the Trustee that they wished to convert their case to Chapter 13 to keep their property. Rather than converting, however, the Debtors sought additional financing and matched Midstate's offer of $21,000.

A hearing on the Original Sale Motion was held on June 20, 2016, at which the Bankruptcy Court authorized the Trustee to conduct an auction to sell the Unimproved Tract. (*Id*. at p. 62.)

---

[1] As an unsecured creditor, Midstate initially filed an unsecured claim in the amount of $113,701.71, with the claim representing a deficiency balance subsequent to foreclosure of certain real property previously owned by the Debtors.

Midstate submitted a new offer for the Unimproved Tract of $31,000, contingent upon inspection of the property. The Debtors responded by matching Midstate's offer but with no contingencies. The Bankruptcy Court reset the hearing on the Original Sale Motion for August 15, 2016. Prior to that hearing, Midstate submitted a new offer: $66,000 for the entire Property,[2] provided that it be allowed to inspect the Property within thirty days of the hearing date and to close on the sale within sixty days. (*Id.*)

At the August 15, 2016 hearing, the Trustee testified that in light of Mr. Hanson's lower appraisals, she was concerned that Midstate was artificially inflating the values of the lots. (Doc. 11 at 7.) This concern stemmed from the fact that Midstate held about 80% of the unsecured debt and would thus significantly benefit from the sale of the Property. The Debtors also testified that they had offered to purchase the Unimproved Tract three times, two of which were in response to Midstate's offers, but because the target kept moving, they were unsure how to save their property. With a new offer to purchase *both* tracts on the table, the Bankruptcy Court ordered that the Trustee file a motion to set a more formal auction to sell the whole Property.

The Trustee filed the motion on August 17, 2016 (the "Amended Sale Motion"), and the final auction was set for August 29, 2016. (Doc. 10 at 64.) Midstate responded to the Amended Sale Motion on August 19, 2016. (*Id.* at 67.) It its response, Midstate again requested access to the Property for inspection prior to the auction.

On August 24, 2016, just days before the auction date, the Debtors filed a motion to convert their Chapter 7 case to a Chapter 13 case, which the Bankruptcy Court granted and confirmed on September 20, 2016. (Doc. 10 at 77.) In the Debtors' original Chapter 13 plan (the "Original Plan"), they proposed $33,000 in payments over sixty months, with $2,500 in attorneys' fees and

---

[2] Prior to this offer, the Trustee had not attempted to sell the Improved Tract, because she believed its value was less than the homestead exemption. (Doc. 10 at 134.)

3

$30,500 going to general unsecured creditors for an approximate 21.8% recovery for unsecured nonpriority claims. (*Id*. at p. 75.) Midstate filed an objection to the Original Plan, arguing it did not satisfy the "best interest of the creditors" test. (*Id*. at p. 80.)

A hearing was held (the "Confirmation Hearing") on Midstate's objection on November 21, 2016. At this time, the Debtors submitted a revised Chapter 13 plan (the "Chapter 13 Plan"), providing for $41,700 in payments over sixty months, with $11,238.51 in attorneys' fees and priority claims, leaving $30,461.49 (with a guarantee of $30,000) for unsecured creditors. (*Id*. at p. 84.) This left roughly the same 21.8% return for unsecured creditors as the Original Plan. The parties agreed that the only issue to be resolved at the hearing was whether the Chapter 13 Plan satisfied the best interest of the creditors test.

The President of Midstate, Kim Klonaris, was the first witness to testify at the Confirmation Hearing. He confirmed that Midstate's original offer was contingent upon first inspecting the Property. (*Id*. at p. 128.) He then stated that Midstate was prepared to remove the contingency entirely, offering $66,000 with no strings attached. (*Id*.) On cross examination, Mr. Klonaris was asked whether Midstate would still give $66,000 for the Property if it turned out that there was a meth lab in the mobile home. (*Id*. at 129.) Mr. Klonaris hesitated, explaining that the offer was based primarily on the land, rather than the structures—prompting counsel for the Debtors to ask why an inspection of the mobile home was necessary to begin with if Midstate was only concerned with the land. To this, Mr. Klonaris responded that "they just wanted to know what they were buying." (*Id*.)

The Bankruptcy Court confirmed the Chapter 13 Plan in an oral ruling at the conclusion of the hearing. (*Id*. at p. 138.) It noted it did not find the testimony of Mr. Klonaris particularly credible, as he had explained that Midstate was primarily concerned with the land, but hesitated

4

when asked if Midstate would follow through with the offer if a meth lab was discovered on the Property. The Bankruptcy Court ultimately found that the Debtors had demonstrated the Chapter 13 Plan as proposed would provide a value to the creditors equal to or greater than they would receive in liquidation.

Midstate subsequently filed a motion to reconsider (the "Motion to Reconsider") the Bankruptcy Court's ruling, which was denied on January 25, 2017. (*Id*. at p. 107.) In its order denying the Motion to Reconsider, the Bankruptcy Court first explained its calculations. It valued the Property at $60,000. It then subtracted a $4,800 realtor/auctioneer fee, a trustee commission of $3,750, and a fee for the legal work required to sell the Property. This left roughly $50,000. After deducting the $20,000 homestead exemption, $30,000 remained to distribute to creditors. The Bankruptcy Court believed this was more than the creditors would have received had the property been liquidated, thus satisfying the best interest of the creditors test.

The Bankruptcy Court then addressed why it did not accept the $66,000 offer from Midstate as the true value of the Property: (1) There was no written offer; (2) the offer was made at a time when there was no one to accept it; (3) the offer was not based on any independent analysis of the Property; (4) the offer was made by a creditor who held about 80% of the debt— meaning it would only be out of pocket about 20% of the price it was offering to pay; and (5) Kim Klonaris's testimony was not credible because Midstate initially wanted to inspect the Property to check for "structural soundness," but then removed that contingency altogether, claiming the land was its primary target.

This appeal followed. Midstate submits two primary objections to the Bankruptcy Court's confirmation of the Chapter 13 Plan. First, the Bankruptcy Court erred by not accepting Midstate's $66,000 offer as the true value of the Property, and as a result, misapplied the best interest of the

creditors test. With a starting point of $66,000, after deducting the requisite costs and exemptions, creditors would have been left with roughly $36,000—higher than the Debtors' $30,000 offer. Second, the Bankruptcy Court failed to discount the proposed monthly payments under the Chapter 13 Plan to net present value, as required by law. If it had done so, according to Midstate, the amount would have fallen below what the creditors would have received in liquidation.

## II. STANDARD OF REVIEW

In an appeal from a bankruptcy court, the district court must uphold the findings of fact made by the bankruptcy court unless such findings are clearly erroneous. *In re Gardner*, 360 F.3d 551, 557 (6th Cir. 2004). The district court reviews *de novo* the bankruptcy court's conclusions of law. *Id*. The district court has the authority to affirm, modify, or reverse a judgment or order of the bankruptcy court and may remand the case to the bankruptcy court for further proceedings. Fed. R. Bankr. P. 8013.

## III. DISCUSSION

### A. Valuation

Midstate first argues the Bankruptcy Court began its best interest of the creditors analysis with an incorrect starting valuation. The Property's true value, Midstate argues, was its non-contingent offer of $66,000, not the Debtors' $60,000 figure on which their Chapter 13 Plan was based.

Commonly referred to as the best interest of the creditors test, 11 U.S.C. § 1325(a)(4) provides that a court shall confirm a proposed bankruptcy plan if:

> [T]he value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date.

In other words, the court is to confirm a Chapter 13 plan where, under that plan, the creditors receive no less than the amount they would have received in payments under a hypothetical Chapter 7 liquidation.

"Value" under this provision is not expressly defined, but it is generally taken to mean "fair market value." *In re Williams*, 480 B.R. 813, 815 (Bankr. E.D. Tenn. 2012). Fair market value has been described in a number of different ways. But most courts tend to define the concept as the price arrived at in an "arm's length transaction." *See, e.g.*, *In re Strever*, 468 B.R. 776, 781 (Bankr. D.S.C. 2012) ("The price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's length transaction."). Or, to put it another way, "the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably, and assuming the price is not affected by undue stimulus." *Id*. at 778 n.3.

Courts further agree that assessment of fair market value is "more art than science," and a variety of factors are to be considered. *Id*. at 782. These include appraisals of property, witness testimony, offers made for the property in question, and comparable arm's length sales, with no single factor being dispositive. Ultimately, it is the Court's job "to filter and evaluate, from all the evidence offered, the admitted evidence which most persuasively focuses on the ultimate issue of valuation." *Matter of Buckland*, 123 B.R. 573, 579 (Bankr. S.D. Ohio 1991). Furthermore, "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." *In re Creekside Sr. Apartments LP*, 477 B.R. 40, 61 (6th Cir. 2012). The operative date for valuation of real property is the date of confirmation of the Chapter 13 plan. *Williams*, 480 B.R. at 817.

7

Two valuation factors of particular relevance here are appraisals and offers. As to the former, courts are to consider a non-exhaustive list of factors in assessing appraisal evidence: "the appraiser's education, training, experience, familiarity with the subject of the appraisal, manner of conducting the appraisal, testimony on direct examination, testimony on cross examination, and overall ability to substantiate the basis for the valuation presented." *Buckland*, 123 B.R. at 578. In this exercise, courts tend to emphasize how detailed an appraisal report may or may not be, the appraiser's familiarity with the property at issue, and the appraiser's use of "comparables"—the selling prices of homes or properties with similar sizes, ages, conditions, and locations. *See Williams*, 480 B.R. at 818–19; *Strever*, 468 B.R. at 782–83; *Buckland*, 123 B.R. at 578–80. The court, however, is not required to accept an appraiser's calculations. "A bankruptcy court is not bound to accept the values contained in the parties' appraisals; rather, it may form its own opinion considering the appraisals and expert testimony." *In re Holcomb Health Care Services, LLC*, 329 B.R. 622, 669 (Bankr. M.D. Tenn. 2004).

Similarly, courts are required neither to accept an offer as the measure of valuation, nor to consider *only* offers to the exclusion of other evidence. The court in *Todd*, for example, refused to accept the highest offer on the property at issue as the measure of that property's value—even though the parties had actually reached a tentative agreement at that price—and instead, opted for a lower offer as more accurately indicative of value. *Todd*, 194 B.R. at 894–95. Furthermore, the court in *In re Weldin-Lynn, Inc.*, 79 B.R. 409, 412 (Bankr. E.D. Ark. 1987), relied heavily on a cash offer for the property at issue in its valuation analysis, but buttressed its valuation with appraisal testimony and the testimony of the offeror himself.

Midstate argues its $66,000 offer is the proper valuation of the Property. It first suggests that offers are superior measures of value, citing language in *Weldin-Lynn* stating "the [c]ourt, in

8

arriving at a market value to be placed on collateral, cannot ignore a cash offer." *Weldin-Lynn*, 79 B.R. at 412. Midstate also contends that the superiority of its cash offer is further evidenced by the fact that Midstate's offers drove the bidding process throughout—the Debtors simply matched Midstate's bids at each stage, eventually resorting to conversion under Chapter 13. Midstate even goes so far as to say that this bid-matching suggests *all* of the Debtors' offers were illusory—the reason the Debtors converted their case to a Chapter 13 proceeding, Midstate suggests, is because they were unable to actually make good on their previous offers. Midstate also submits its offer more closely resembles an "arm's-length transaction" under "ordinary selling conditions" and is thus more indicative of value.

The Debtors agree that the "arm's-length transaction" is the general standard governing valuation. But the notion that the Bankruptcy Court was bound to accept Midstate's offer, they argue, is off base. They contend that the task of the bankruptcy court in assessing value is to consider all the relevant evidence before it, including offers, appraisals, witness testimony, and context, and that this is precisely what the Bankruptcy Court did when it credited their evidence over that of Midstate.

The Debtors have the better argument. First, as noted above, *Todd* does not *require* a court to accept an offer as the true value of property; it merely instructs the court not to ignore a cash offer, and the Bankruptcy Court, here, did no such thing. It expressly considered the offer and the attendant testimony and discredited the evidence. Further, the Court fails to see how Midstate's driving of the bidding war materially helps its case. In matching Midstate's offers, the Debtors simply attempted to save their home and pay as little as possible to do so. Neither that, nor the conversion to Chapter 13 proceedings, necessarily means each of the Debtors' offers were made in bad faith. Finally, the circumstances surrounding the bidding war hardly mirror an "arm's-

length transaction" under "ordinary selling conditions." Midstate and the Debtors were essentially the only parties in contention for the Property. The Debtors were bidding in an attempt to keep their own home—unlike the average homeowners willingly putting their property on the open market in hopes of selling their property. And unlike the average buyer, Midstate—because of the size of its unsecured claim—would only be out of pocket about 20% of the price it was offering to pay. Midstate's offer is certainly a factor for the Court to consider in evaluating the Property. It is not, however, dispositive.

In light of these principles, the Bankruptcy Court did not clearly err in its valuation analysis. It considered a wide range of evidence before it: the Debtors' own approximation of the Property in Schedule A of their Chapter 7 petition, Wendell Hanson's appraisal of the Property, the Trustee's testimony at the Confirmation Hearing that $50,000 was a reasonable price, the bidding history, Midstate's $66,000 offer, and the Real Estate Assessment Data (Doc. 10 at 54) submitted by Midstate concerning the Property. The Bankruptcy Court noted that Midstate held 80% of the unsecured debt and would thus directly benefit in that proportion with respect to the amount offered.[3] And it also took account of Mr. Klonaris's testimony at the Confirmation Hearing that Midstate was initially concerned with the structural soundness of the Property's improvements, while later testifying Midstate was concerned only with the land. Moreover, Mr. Hanson's and the Trustee's testimony were derived from an actual examination of the Property, while Midstate never inspected it. The Bankruptcy Court was wary that Midstate may have inflated the price with its offer and gave more weight to the evidence in favor of the Debtors,

---

[3] Midstate counters this worry by pointing out that *all* general unsecured creditors would benefit from a higher bid, not just Midstate. But given that Midstate held a steep 80% of the unsecured debt, this point does little to detract from Midstate's interest in a high bid.

arriving at a value of $60,000. Given the discretion afforded bankruptcy courts in evaluating property, the Court cannot say the Bankruptcy Court's valuation was clearly erroneous.

**B. Net Present Value**

Midstate next argues the Bankruptcy Court erred in failing to discount the Debtors' Chapter 13 payments to net present value. As alluded to above, the best interest of the creditors test "requires two separate calculations." *In re Engle*, 496 B.R. 456, 461 (Bankr. S.D. Ohio 2013). "First, the court must consider the value, as of the effective date of the proposed Chapter 13 plan, of the property to be distributed to each unsecured creditor in Chapter 13, taking into account the Chapter 13 administrative expenses. . . . Next, the court must consider the amount that would be paid on each allowed unsecured claim if the debtor's estate were liquidated in a hypothetical Chapter 7 case, taking into account the Chapter 7 administrative expenses." *Id*. In addition, however, the "property to be distributed under a Chapter 13 plan *must be reduced to present value* when applying the liquidation test set forth in § 1325(a)(4)." *In re Hardy*, 755 F.2d 75, 76 (6th Cir. 1985) (emphasis added); *see also In re Martin*, 17 B.R. 924, 926 (N.D. Ill. 1982) ("The use of a present value approach under § 1325(a)(4) is supported by the weight of authority.").

Midstate argues the Bankruptcy Court erred in failing to discount the monthly payments provided for in the Debtor's Chapter 13 Plan to net present value. The Debtors' Chapter 13 Plan provided for monthly payments of $695.00 over the course of sixty months. Midstate's offer, in contrast, provided for an immediate payout. Had the court accounted for the depressive effect the passage of time would have had on the value of the Debtors' payments, the amount the creditors would have received under the Debtors' Chapter 13 Plan, according to Midstate, would have been less than the creditors would have received had the Property been liquidated under Chapter 7.

At oral argument, the Debtors conceded the general rule that bankruptcy courts must discount payments to be made under a Chapter 13 plan to net present value when applying the best interest of the creditors test. They maintain, however, that Midstate waived this argument by failing to raise it in the lower court. The issue was unaddressed at the Confirmation Hearing and only mentioned in passing in Midstate's Motion to Reconsider. As such, the Debtors argue, the issue is not properly before the Court.

It is well established that courts of appeal should generally decline to consider arguments not previously raised in the lower court. *See, e.g.*, *Hardy v. Reynolds & Reynolds Co.*, 311 F. App'x 759, 762 (6th Cir. 2009). However, the Sixth Circuit Court of Appeals has recognized exceptions to this general rule where the "arguments not previously raised . . . are pure questions of law, or where injustice might otherwise result." *Id*. *See also Kalamazoo River Study Group v. Rockwell Intern. Corp.*, 355 F.3d 574, 587 n.5 (6th Cir. 2004); *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit*, 163 F.3d 341, 360 n.9 (6th Cir. 1998); *City Mgmt. Corp. v. U.S. Chemical Co., Inc.*, 43 F.3d 244, 255 (6th Cir. 1994); *Mich. Bell Tel. Co. v. Baraga Tel. Co.*, No. 2:00–CV–136, 2001 WL 34778963, at *4 (W.D. Mich. Aug. 8, 2001). In applying this exception, the Sixth Circuit "tend[s] to view more favorably arguments that have been raised in substance [in the lower court], although not explicitly." *Reynolds & Reynolds*, 311 F. App'x at 762.

Here, the question of whether the payments under the Debtors' Chapter 13 Plan should have been discounted to net present value is purely one of law—no fact-finding is involved. Additionally, Midstate did mention the issue—albeit in passing—in its Motion to Reconsider before the Bankruptcy Court: "The proposed Chapter 13 plan must be present value to compensate unsecured creditors for the delay in payments they would receive immediately in a liquidation

12

proceeding." (Doc. 10 at 92.) It further noted that "for a Chapter 13 plan to satisfy the best interest of creditors test, 'the capitalized present value of all deferred payments proposed to be distributed, together with the present value of any other property proposed to be distributed, to the holder of an allowed unsecured claim, must equal at least the liquidation value of the nonexempt property of the estate apportionable to the holder of such allowed unsecured claim.'" (*Id.*) (quoting *In re Fuentes*, 504 B.R. 731, 735-36 (Bankr. D. Puerto Rico 2014).

While these tangential comments, alone, may not have sufficed to preserve other types of arguments on appeal, because they are directed at a pure question of law, the Court addresses Midstate's argument and finds it persuasive. The Sixth Circuit Court of Appeals has made clear that when employing the best interest of the creditors test, the payments to be made under a Chapter 13 plan must be discounted to present value. *Hardy*, 755 F.2d at 76 ("[P]roperty to be distributed under a Chapter 13 plan must be reduced to present value when applying the liquidation test set forth in § 1325(a)(4)."). Accordingly, the Court concludes that the Bankruptcy Court erred in failing to discount the payments under the Debtors' Chapter 13 Plan to present value when comparing the amount creditors would receive under that plan with the amount creditors would have received in a hypothetical Chapter 7 liquidation.

## IV. CONCLUSION

For the foregoing reasons, the Bankruptcy Court's order confirming the Debtors' Chapter 13 Plan will be **AFFIRMED** in part and **REVERSED** in part. The Court will **REMAND** the case to the Bankruptcy Court for further proceedings consistent with this opinion.

**An order shall enter.**

                                        **/s/**
                                        **CURTIS L. COLLIER**
                                        **UNITED STATES DISTRICT JUDGE**